Juana RODRIGUEZ, by her son and next friend, Wilfredo RODRIGUEZ; Amelia Russo; Mary Weinblad by her daughter and next friend, Susan Downes; Christos Gouvatsos; and Sidonie Bennett; individually and on the behalf of all others similarly situated, Plaintiffs,

and

Ruvim Aselrod, by his daughter and next friend Maria Smirov; Isadora Baez, by her daughter and next friend Gladys Osorio; Doris Pollard; Shelton Bean, by his mother and next friend Helen Bean; Cipriano Soliven, by his daughter and next friend, Dominga Vocal; Maria Vizueta, by her son and next friend, Mario Vizueta; Inez Feliciano, by her son and next friend, Frank Quiles; Marta Anderson; Mollie Schiffer; Geraldine Johnson, by her son and next friend, Phillip Thomas; Mariamma David, by her son and next friend, Fredy David; Ann Reece, by her sister-in-law and next friend, Pearl Malcolm; individually and on the behalf of all others similarly situated, Proposed–Plaintiff–Intervenors,

v.

Barbara DEBUONO, Commissioner of the New York State Department of Health, and Brian Wing, Acting Commissioner of the New York State Department of Social Services, Defendants,

and

Commissioner, New York City Department of Social Services; Commissioner, Nassau County Department of Social Services; Commissioner, Suffolk County Department of Social Services; Commissioner, Westchester Department of Social Services, Intervenor–Defendants.

No. 97 CIV. 700(SAS).

United States District Court,
S.D. New York.

Aug. 25, 1997.

Leslie Salzman, Paris Baldacci, Toby Golick, Cardozo Bet Tzedek Legal Services, New York City, Donna Dougherty, Queens Legal Services for the Elderly, Rego Park, NY, Michael Scherz, Yisroel Schulman, New York Legal Assistance Group, New York City, for Plaintiffs and Intervenor–Plaintiffs.

James M. Herschler, Assistant Attorney General, Attorney General for the State of New York, New York City, for Defendant State of New York.

Judith C. McCarthy, Assistant Corporation Counsel, Corporation Counsel of the City of New York City, for Intervenor–Defendant City of New York.

Michael T. Hopkins, Lark Teitler, (Deputy County Attorney), Hopkins, Kopilow & Weil, Garden City, NY, for Intervenor–Defendant Nassau County.

Lori A. Alesio, Senior Assistant County Attorney, White Plains, NY, for Intervenor–Defendant Westchester County.

Barbara Barton, Assistant County Attorney, Hauppauge, NY, for Intervenor–Defendant Suffolk County.

### AMENDED OPINION & ORDER

SCHEINDLIN, District Judge.

This is a class action challenging the design and implementation of task-based assessment ("TBA") programs, used throughout New York State to determine the amount of personal care services hours provided to eligible Medicaid applicants and recipients. The individually named Plaintiffs are recipients and applicants of personal care services who allege that TBA programs systemically fail to provide medical care mandated by federal law.[1] Plaintiffs also allege that the TBA notices currently in use throughout the State violate due process and federal law. Defendants are the Commissioner of the

---

1. Two of the named Plaintiffs, Christos Gouvatsos and Amelia Russo, died during the pendency of the motions now before the Court. Mr. Gouvatsos was an applicant for personal care services, rather than a recipient. Defendants have not raised the issue of whether the claims represented by these named Plaintiffs survive their deaths for purposes of class certification, absent the substitution of other named Plaintiffs. The Supreme Court has stated that "there may be cases in which the controversy involving the named Plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case." *Sosna v. Iowa,* 419 U.S. 393, 402 n. 11, 95 S.Ct. 553, 559 n. 11, 42 L.Ed.2d 532 (1975). Here, Plaintiffs moved for class certification promptly after the filing of the Complaint. I deferred decision on that motion pending a motion for intervention, which Plaintiffs believed would further illuminate and support the class-based nature of their claims. That motion was fully submitted only recently. In addition, the hearing on this matter was suspended for several weeks during the course of extensive settlement efforts with the Magistrate Judge. Finally, the claims of the proposed Intervenor–Plaintiffs re-

New York State Department of Health and the Acting Commissioner of the New York State Department of Social Services (the "State"); Intervenor–Defendants are the respective Departments of Social Services of the City of New York, (the "City"), Nassau County ("Nassau"), Westchester County ("Westchester"), and Suffolk County ("Suffolk")(collectively with the State, "Defendants"). Presently before the Court are Plaintiffs' motions for class certification, and for a preliminary injunction.[2] For the reasons stated below, Plaintiffs' motion for class certification is granted in part and denied in part. Plaintiffs' motion for a preliminary injunction is also granted in part and denied in part.

This Amended Opinion is issued following Plaintiffs' Motion for Reconsideration, which was timely filed on August 18, 1997. In that motion Plaintiffs sought two amendments to the original Opinion: (1) a clarification as to whether the notice to applicants and recipients must include the distribution of the total hours authorized; and (2) a deletion of the discussion regarding the viability of a private right of action under 42 C.F.R. § 440.230(b) on the ground that it was unnecessary for the Court to reach this issue in view of its substantive holdings. Both of these requests have been granted in this Amended Opinion. Accordingly, the August 4, 1997 Opinion and Order is hereby withdrawn and is superseded by this Opinion and Order.

## I. FACTUAL BACKGROUND

### A. Personal Care Services in New York State

Medicaid, established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid Act"), provides medical assistance to individuals whose income and resources are insufficient to meet the costs of medical care, and who are either age 65 or over, blind, disabled, or members of families with dependent children. In New York, the State is the agency responsible for the implementation of the State's Medicaid plan. N.Y. Soc. Serv. L. § 363–a(1). The City, Nassau, Suffolk, and Westchester administer . the Medicaid program in their respective districts under the supervision of the State. Each local social services district has discretion to manage its own personal care services program within the guidelines of federal and state regulations. N.Y. Soc. Serv. Law § 62(1).

"Medical assistance" is defined to include "personal care services furnished ... in a home or other location." 42 U.S.C. § 1396d(a)(xi)(24); N.Y. Soc. Serv. L. § 365–a(2)(e). New York has opted to include the federal option for home care services, including personal care services, in its State Medicaid plan. *See* 42 U.S.C. § 1396d(a)(xi)(24); 42 C.F.R. § 440.170(f); N.Y. Soc. Serv. Law § 365–a(2)(e). "Personal care services" include assistance with tasks associated with the "activities of daily living," or "ADLs," which include bathing, toileting, assistance with medications, personal hygiene, dressing, feeding and light housekeeping and shopping. 18 N.Y.C.R.R. §§ 505.14(a)(6)(i)(a), (ii)(a). Such assistance must be medically necessary and "essential to the maintenance of the patient's health and safety in his or her own home." N.Y. Soc. Serv. L. § 365–a(2)(e); 18 N.Y.C.R.R. §§ 505.14(a)(1),(4).

---

veal that substitution of one of these parties for the named Plaintiffs will be possible. Therefore, the certifications of the classes described below in Part II.A. relate back to the filing of the Complaint.

**2.** Plaintiffs also seek leave to permit twelve additional Medicaid home care recipients to intervene in this action. Because the proposed intervenors have the same legal claims as the named Plaintiffs, this motion is granted. *See* Fed. R.Civ.P. 24(b)(2) (authorizing intervention "when an applicant's claim or defense and the main action have a question of law or fact in common"); *Security Pac. Mortgage and Real Estate Servs., Inc. v. Republic of Philippines*, 962 F.2d 204, 208 (2d Cir.1992) (decision to permit intervention falls within court's sound discretion).

I reject Defendants' contention that the addition of these Intervenor–Plaintiffs will unnecessarily delay and complicate the case. Although Defendants' observation that the preliminary injunction hearing involving only the five named Plaintiffs was lengthy, the testimony concerning the individual facts of those Plaintiffs' cases was quite brief. The majority of the time was spent taking the testimony of various administrators of Defendants' respective social services programs. That oral testimony need not be taken again at a trial on the merits.

To be eligible for the home care program, a patient must have a stable medical condition and be self-directing. *See* 18 N.Y.C.R.R. § 505.14(a)(4). A stable medical condition is one which is "not expected to exhibit sudden deterioration or improvement," and does not require frequent medical or nursing judgment to determine necessary changes in care, skilled professional care (*e.g.* skilled nursing care rather than a personal care services aide), or on-going professional assessment. *Id.* § 505.14(a)(4)(i). "Self-directing" means that the patient must be able to direct the personal care services attendant and to make choices and take responsibility for their ADLs. *Id.* § 505.14(a)(4)(ii).

A non-self-directing patient is still eligible for home care services if another self-directing individual or agency is willing to provide the direction of the home care attendant on behalf of the non-self-directing patient "on an interim or part-time basis." *Id.* § 505.14(a)(4)(ii)(a)-(c). The State has described the characteristics of a non-self-directing recipient as someone who may be delusional or agitated, have a tendency to wander or to expose himself or herself to hot water, extreme cold or misuse of appliances in the home, or may exhibit behaviors such as hiding medications, or taking medications without his or her physician's knowledge. *See* State Exh. 2, Administrative Directive to Commissioners of Social Services (92 ADM–49), dated December 1, 1992.

State regulations permit the authorization for eligible recipients of up to "continuous, 24–hour personal care services," or "uninterrupted care, by more than one person, for a patient who ... requires total assistance with toileting and/or walking and/or transferring and/or feeding at unscheduled times during the day and night." 18 N.Y.C.R.R. § 505.14(3). In part to defray the obvious costs of 24–hour home care services, the State legislature has imposed a fiscal cap on home care cases where the cost of medically necessary care exceeds 90% of the cost of a residential health facility and the individual does not meet one of five exceptions. N.Y. Soc. Serv. L. § 367–k.

In the last five years, Intervenor–Defendants the City, Nassau, Suffolk and Westchester have all implemented TBA programs or use TBA as an assessment instrument for home care services within their districts. The City's program was implemented as recently as 1996. Although the specifics of TBA assessment procedures vary from district to district, the basic assessment process involves a medical request for home care from the applicant's or recipient's physician, which is followed by an assessment by a nurse and social worker in the recipient's or applicant's home. *See* Transcript of Preliminary Injunction Hearing ("Tr.") 784–88. The assessing nurse uses a TBA form, which differs from district to district, to assess the needs of the patient. The form includes a list of various tasks, *e.g.* toileting, bathing, etc., the amount of assistance needed as to each task, and may include the time of day the tasks are performed. *See, e.g.*, City Exh. B; Nassau Exh. D. Regardless of whether "task times," or the amount of time suggested for each task, appears on the TBA form itself, each district provides suggested "task times" to the nurses performing assessments. The City adds an additional step to its assessments process, by sending its three assessment tools—the physician's request, the nurse's assessment and the social work assessment—to what is called a medical review team ("MRT"), *see* Tr. 580, which makes the final determination of what the plan of care should be. Tr. 581–83. If there are discrepancies between the documents, the MRT takes steps to resolve them before finalizing the plan of care. Tr. 578–79, 721, 761, 1014.

The recipient or applicant is then given notice of the decision about what services the agency will provide. Both are entitled to appeal the agency's decision via the fair hearing process. 42 C.F.R. § 431.220; N.Y. Soc. Serv. Law § 22.

### B. Individual Plaintiffs [3]

#### 1. *Sidonie Bennett*

Plaintiff Sidonie Bennett is 80 years old and resides in Kew Gardens, Queens. She

---

**3.** The following facts are drawn from testimony at the preliminary injunction hearing, the case files of the named Plaintiffs, and Plaintiffs' and Defendants' respective Findings of Fact ("FOF").

suffers from Parkinson's disease, which causes involuntary movement of her extremities and makes her susceptible to falling. In June 1996, Mrs. Bennett fell down a flight of stairs causing a brain trauma, and was hospitalized for six weeks. Upon Mrs. Bennett's release from the hospital, the City authorized twelve hours a day of skilled nursing care from a certified home health agency under Medicaid's expedited discharge program. Her daughter arranged to pay privately for an additional twelve hours of care.

In September 1996, Mrs. Bennett's case was converted from skilled nursing care to personal care services. Her physician's medical request for home care recommended 24–hour care. The nurse's assessment noted that Mrs. Bennett had a need for total assistance with toileting, changing of diapers, transferring, and some assistance with indoor mobility, and recommended 73.3 hours of weekly task time. She was approved for 73 hours of service (or slightly over 10 hours per day) in a single visit, with a personal emergency response system ("PERS"), which would have resulted in her being left alone for two hours per day. A second nurse's assessment was completed in October 1996. The nurse recommended increased tasks, finding that Mrs. Bennett experiences trem-

ors, is at risk of falling, is very confused at times and needs constant supervision.

Mrs. Bennett requested a fair hearing to challenge the City's failure to provide her with split-shift services, or 24–hour care from more than one aide. She received aid continuing pending the decision. The City contends that it believed her daughter would continue to pay for twelve hours per day of service when it assessed Mrs. Bennett. The City further contends that when it learned her daughter was no longer able to provide this care, it offered to reassess Mrs. Bennett. Mrs. Bennett's daughter refused the City's offer to reassess, and the case proceeded to a fair hearing. The fair hearing decision remanded the case to the agency and directed it to reassess Mrs. Bennett. Mrs. Bennett has since been reassessed and currently receives split-shift services.

### 2. Christos Gouvatsos [4]

Plaintiff Christos Gouvatsos was a 59 year old man suffering from end stage renal disease. He resided in Bayside, New York. At the time this lawsuit commenced, Mr. Gouvatsos had suffered a stroke, was hospitalized, and was not receiving home care services.[5] Tr. 1038. Prior to his hospitalization,

See generally Tr. 229–270, 1039–1040, Pls.' FOF Pt. V, ¶¶ 50–58, Defs.' FOF ¶¶ 166–180, Pls.' Exh. 4 (Bennett); Pls.' FOF Pt. V, ¶¶ 59–66, Defs.' FOF ¶¶ 181–188 (Gouvatsos); Tr. 61–91, 537–554, Pls.' FOF Pt. VI.A, ¶¶ 14–17, Defs.' FOF ¶¶ 218–219; Pls.' Exh. 2, Nassau Exh. C (Rodriguez); Tr. 188–228, 329–365, Pls.' FOF Pt. VI.A, ¶¶ 18–21, Defs.' FOF ¶¶ 220–222, Pls.' Exh. 3, Nassau Exh. A (Weinblad); Tr. 1–61, 367–387, Pls.' FOF Pt. VI.A, ¶¶ 22–28, Defs.' FOF ¶¶ 223–226, Pls.' Exh. 1, Nassau Exh. A (Russo). See also Exhibits to Declaration of Donna Dougherty, attorney for Plaintiffs, dated Feb. 3, 1997.

4. I have already found that despite the deaths of Mr. Gouvatsos and Mrs. Russo, class certification of Plaintiffs' claims relates back to filing of the Complaint, and therefore the claims of the classes that they represent survive their deaths until substitution of another Plaintiff. See footnote 1, supra. Plaintiffs offered Mr. Gouvatsos as a class representative of both their notice claims and "span of time" needs claims. Because other named Plaintiffs and Intervenor–Plaintiffs from the City raise "span of time" claims and Mr. Gouvatsos is now deceased, I shall not discuss the details of his case as it relates to "span of time" issues. I include Mr. Gouvatsos only as a temporary representative for

the notice issue pending the substitution of another Plaintiff. I also note that Intervenor–Plaintiff Cipriano Soliven challenges his initial notice from the City that failed to include the total number of hours authorized. See Pls.' Exh. 5(19).

5. In conjunction with the class certification motion, the City had argued that Mr. Gouvatsos lacked standing because he was not receiving home care services at the time that motion was made. I disagree. As an initial matter, Mr. Gouvatsos' home care was not terminated by his hospitalization as a matter of law. See Granato v. Bane, 74 F.3d 406 (2d Cir.1996). Moreover, because Mr. Gouvatsos had been hospitalized and had returned to the City's home care services program in the past, and because he had intended to do so again, he had a substantial likelihood of being assessed again under TBA and thereby suffering injury in the future. See Robidoux v. Celani, 987 F.2d 931, 938 (2d Cir. 1993). His injury at the time this suit was commenced was therefore "sufficiently real and immediate" to confer standing. See City of Los Angeles v. Lyons, 461 U.S. 95, 105, 103 S.Ct. 1660, 1666–67, 75 L.Ed.2d 675 (1983). In addition, Mr. Gouvatsos had received an allegedly

Mr. Gouvatsos was assessed as needing assistance with several ADLs. At the conclusion of his assessment process, Mr. Gouvatsos received an initial notice of authorization from the City that listed the tasks he would receive, but did not include the total number of hours authorized.

### 3. *Juana Rodriguez*

Plaintiff Juana Rodriguez is 79 years old and suffers from Alzheimer's disease. She resides in Rockville Center in Nassau County. Until May 1996, Mrs. Rodriguez had been receiving 24–hour split-shift care from Nassau's long term home health care program. Those services were terminated when the total cost of that care exceeded the maximum cost per day allowable under Medicaid. Mrs. Rodriguez then began to receive personal care services. The nurse's assessment in May 1996 indicated that Mrs. Rodriguez needed total assistance with grooming, bathing, dressing, toileting, feeding, transferring and housekeeping. The total time allotted for these tasks was 67.16 hours per week, or 9.59 hours per day. She was authorized for 24–hour sleep in care.

Mrs. Rodriguez requested a fair hearing on May 6, 1996, to challenge Nassau's failure to provide her with split-shift care. The fair hearing examiner affirmed Nassau's determination that sleep-in care was appropriate, in part based on testimony from the assessing nurse that Mrs. Rodriguez's nighttime needs could be met by a sleep-in aide.

### 4. *Mary Weinblad*

Plaintiff Mary Weinblad, who is 87 years old, also suffers from Alzheimer's disease. She lives in Uniondale in Nassau County. Until April 1996, Mrs. Weinblad's daughter had paid for 24–hour private care. The strain on family resources led Mrs. Weinblad to apply for personal care services. Her initial assessment authorized four hours of care per day. In August 1996, when Mrs. Weinblad was reassessed, her mental condition had deteriorated. The nursing assessment indicated that she needed partial assistance with bathing, grooming, and dressing, while her physician's request for personal care services indicated that she is occasionally forgetful and confused. In addition, she requires a special diet, and takes several medications a day. She was reauthorized to receive four hours of care per day, seven days per week.

Mrs. Weinblad requested a fair hearing. In October 1996, the fair hearing examiner upheld the four hours of service, despite the fact that Mrs. Weinblad "needs twenty-four hour supervision." Pls.' Exh. 3 at 5. The examiner based this conclusion on a determination that "[t]he remainder of the time Appellant needs services in the nature of supervision and companionship and one to one cuing [which] are not appropriate tasks for personal care services aides." *Id.*

### 5. *Amelia Russo* [6]

Plaintiff Amelia Russo was diagnosed with Alzheimer's disease in 1994. Shortly thereafter, Mrs. Russo applied for home care services, and was assessed as having a need for partial assistance with several ADLs. She, like Plaintiff Mary Weinblad, did not receive task time for safety monitoring, although she had a tendency to wander and to leave on the stove burners. Nassau authorized four hours of personal care service, three days per week. After an incident during which Mrs. Russo was agitated and allegedly swung a broom either at her aide or at the bathroom door (the details of the incident are disputed), Nassau terminated her personal care services based on a finding that she could not be safely maintained at home. Mrs. Russo challenged that determination at a fair hearing. The termination of Mrs. Russo's services was upheld at a fair hearing in January 1996. Mrs. Russo died prior to the resolution of the pending motions in this matter.

defective initial notice of authorization when this suit was commenced, and had standing to challenge that notice.

6. As with Mr. Gouvatsos, the claims raised by Mrs. Russo's case are raised by other named Plaintiffs and Intervenor–Plaintiffs. I include the facts of her case solely for completeness.

### C. Intervenor–Plaintiffs [7]

Ten of the Intervenor–Plaintiffs are from the City, while two are from Nassau. Like the named Plaintiffs, many of the Intervenor–Plaintiffs are elderly people over the age of 80. While I will not provide summaries for each proposed Intervenor–Plaintiff, the following is a general description of the issues raised by the Intervenor–Plaintiffs' cases. Collectively, the Intervenor–Plaintiffs raise notice, safety monitoring, and span of time issues.

Most City Intervenor–Plaintiffs received a reduction of hours after they were reassessed under TBA. For example, Ruvim Aselrod was reduced from 77 to 58 hours per week of personal care services under TBA. At the time of the reduction, he needed assistance with bathing, dressing, grooming, preparation for bed, toileting, transferring, indoor mobility, preparation of 3 meals and 2 snacks, cutting food three times daily, and taking medications four times per day. Other Intervenor–Plaintiffs requested an increase in services, but when reassessed under TBA, also received a reduction. For example, Doris Pollard received a reduction from 8 hours per day (with one duty free hour, or an hour when the aide does not perform personal care services) to 7 hours per day, after her physician requested an increase in service to 12 hours per day. Ms. Pollard's plan of care indicated that she needs assistance with toileting, transferring, taking medications three times daily, preparation of meals and snacks, encouragement to eat three meals, and grooming. Cipriano Soliven, in addition to having received an allegedly inadequate initial notice of authorization, received an allegedly inadequate assessment as well. He has suffered a series of strokes, exhibits impaired judgment and memory, and needs assistance with toileting, ambulation, transferring and eating. His physician requested that he receive services in the range of 10 to 12 hours per day, but he was authorized for 6 hours per day Monday through Saturday and 5 hours on Sunday, to be provided in a single block of time.

Nassau Intervenor–Plaintiff Mariamma David is an 85 year old applicant for personal care services who suffers from a form of dementia. Although the nurse assessor found that Mrs. David forgets where she is going and what she is doing, she was not assessed as needing assistance with toileting or ambulation, but only with bathing, grooming, and dressing, as well as household chores. The nurse found that she was inappropriate for personal care services because she "needs 24 hour direction and supervision." Although Nassau had agreed to authorize 6 to 8 hours of care if Mrs. David's family would pay for the remaining hours, it did not in fact authorize any care. That determination was upheld in a fair hearing.

Plaintiff–Intervenor Ann Reece had been receiving sleep-in personal care services from Nassau. Although she was assessed as needing assistance with bathing, grooming, feeding, meal preparation, and household tasks, her service was discontinued because she allegedly could not be safely maintained at home without constant supervision. In addition, although the nurse noted that Mrs. Reece needed assistance locating the bathroom, she was not given time for assistance with toileting. The discontinuation of services was upheld at a fair hearing.

## II. DISCUSSION

### A. Class Certification

For purposes of their notice claims, Plaintiffs seek certification of a class consisting of all New York State Medicaid home care applicants and recipients whose need for home care services has been or will be determined pursuant to TBA. Additionally, for purposes of their substantive challenges to TBA, Plaintiffs seek to certify a sub-class of New York State home care applicants and recipients who have received or will receive an inadequate home care authorization due to the TBA programs' systemic failure:

(1) to provide safety monitoring unrelated to a specific task; and

(2) to authorize sufficient hours of care to cover the span of time during which

---

**7.** The facts of the Intervenor–Plaintiffs' cases are drawn from the Declaration of Leslie Salzman in Support of Motion for Intervention, attorney for Plaintiffs, dated June 9, 1997.

**152**

unscheduled and recurring needs occur.

An example of an unscheduled and recurring need that occurs over a span of time rather than at discrete times would be the need for toileting, which can occur at any time of the day or night.

Class certification is governed by Federal Rule of Civil Procedure 23. Plaintiffs must first satisfy Rule 23(a)'s four requirements: (1) a class so numerous that joinder is impracticable; (2) questions of law or fact that are common to the class; (3) named parties with claims typical of the class; and (4) class representatives who will fairly and adequately protect the interests of the class. Next, Plaintiffs must establish that the case falls within one of Rule 23(b)'s categories for which a class action is appropriate. Under Rule 23(b), a class action is appropriate where the requirements of subdivision (a) are met and either: (1) the prosecution of separate actions could result in inconsistent adjudications, establish inconsistent standards of conduct, or prejudice the interests of others; (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or (3) questions of law common to the members of the class predominate and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See* Fed.R.Civ.P. 23(b).

1. *Rule 23(a)*

a. Notice Claims Class of All New York State Applicants and Recipients Who Will Be Assessed Pursuant to TBA

■ More than one notice is at issue in this case, as the City's notices differ substantially from the other districts' notices, which also differ from one another in some respects. Plaintiffs challenge the City's notices on the grounds that: (1) the initial authorization notice does not provide the number of home care hours for which an applicant has been authorized; and (2) neither the initial nor the reauthorization notice alerts recipients to the daily or weekly schedule for authorized services. Plaintiffs also challenge the remaining districts' notices on the grounds that while they provide the number of hours and days per week of service, these notices do not inform the applicant or recipient of the tasks that will be performed, or the time of day those tasks will be performed. Each notice has been approved by the State.

This proposed notice class is sufficiently numerous such that joinder would be impracticable. As of September 1996, by the City's own calculations, approximately 40,000 potential class members currently receive Medicaid home care services.[8] In October 1996, the City began reassessing 25,000 of these cases to determine whether conversion to a TBA plan was appropriate. Defs.' FOF ¶ 65. Nassau has approximately 3000 personal care cases. *Id.* ¶ 214. Westchester has approximately 1700 personal care services recipients. Tr. 1316. Suffolk has approximately 1500 recipients. *See* Pls.' Exh. 33. Each of these recipients, as well as future applicants, will encounter one of the challenged notices as part of the assessment and authorization process. In addition, joinder is often not practicable where class members have limited financial resources and would be unable to bring individual suits. *See Robidoux,* 987 F.2d at 936. Here, members of the proposed class suffer from mental or physical impairments or both, many are elderly; and all have limited financial resources.

Plaintiffs' notice claims also raise a question of law common to the proposed class, namely, the sufficiency of the notices. Either the notices satisfy both the relevant regulations and statutes and due process, or they do not. Plaintiffs also satisfy the typicality requirement, as "each class member's [notice] claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant[s'] liability." *Robidoux,* 987 F.2d at 936. Fi-

---

8. *See* Affirmation of Michael D. Scherz, attorney for Plaintiffs, dated February 11, 1997, Exh. B

(HRA FACTS: November 1996).

nally, the class representatives are capable of fairly and adequately protecting the interests of the proposed class. "The adequate-representation requirement is satisfied by a commonality of interests between representatives and class members and vigorous prosecution by plaintiff[s] and plaintiffs' counsel." *Akerman v. Oryx Communications, Inc.*, 609 F.Supp. 363, 378 (S.D.N.Y. 1984), *aff'd*, 810 F.2d 336 (2d Cir.1987). The named Plaintiffs, Intervenor–Plaintiffs, and their counsel meet this standard.

#### b. Subclass of Applicants and Recipients with Safety Monitoring Needs

■ The proposed safety monitoring subclass also meets the requirements of Rule 23(a). First, the proposed subclass is numerous enough that joinder would be impracticable. Because the State does not require TBA programs to provide safety monitoring as a separate task, the State's policy has a statewide effect on all Medicaid home care applicants and recipients who presently need safety monitoring or will need it in the future. If past numbers are any indication, this group is quite large.[9] *See, e.g.*, Pls.' Exh. 15; State Exh. 8. Additionally, Plaintiffs' expert testified that "Alzheimer's disease is the most common cause of cognitive impairment in the elderly," Tr. 432, and that "the rate of cognitive impairment in persons over 80 to 85 is extremely high." Tr. 433. State studies of both New York City and "Upstate" home care recipients indicated that 41 percent and 38 percent, respectively, were 80 years old or older. *See* Pls.' Exh. 15; State Exh. 8. As noted above, the proposed class of physically or mentally im-

paired, often homebound persons have limited financial resources and would have great difficulty bringing individual suits. Plaintiffs have therefore shown that the safety monitoring subclass is so numerous that joinder would be impracticable as required by Rule 23(a).

Turning to commonality, it is the State's position and policy that safety monitoring does not constitute a separate task for TBA purposes, although the State allows the individual counties to provide it voluntarily. *See* Tr. 717, 809, 1509, 1512; State Exh. 1. Plaintiffs claim that the Medicaid Act and regulations, the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, require, as a matter of law, that the home care services program provide safety monitoring as a separate task. The resolution of this dispute thus presents a common question of law for the entire subclass. The safety monitoring claim of the named Plaintiffs and Intervenor–Plaintiffs are also typical of the class, as Plaintiffs contend that the same allegedly unlawful conduct—the failure to provide safety monitoring in contravention of federal law—affects both the named Plaintiffs and the class. *See Robidoux*, 987 F.2d at 931. Finally, as already noted, the named Plaintiffs, Intervenor–Plaintiffs, and their counsel will fairly and adequately protect the interests of the class.

#### c. Subclass of Applicants and Recipients with Span of Time/Unscheduled and Recurring Needs

■ A statewide "span of time" subclass is

9. A 1994 DSS study of the home attendant program in New York City from 1992–93, which surveyed 1266 New York City home attendant cases, found that approximately 77% of personal care recipients were receiving "safety monitoring" as a service. Pls.' Exh. 15 at 15. This study was conducted prior to the City's implementation of TBA. Tr. 908. The report does not indicate whether safety monitoring was provided as a separate task or in conjunction with other tasks, although safety monitoring comprises a distinct category. Tr. 874–77. Based on the 1994 report's statistics about short-term memory impairment and wandering, however, it stands to reason that some proportion of the home attendant service recipients were provided with safety

monitoring as a separate task. The 1994 DSS study revealed that approximately 31% of the home care population exhibited short term memory impairment some of the time, while approximately 9% always exhibited such an impairment. Pls.' Exh. 15 at 25. Approximately 10% of City home care recipients tended to wander some of the time, while approximately 3% wandered always. *Id.* at 30. DSS's Upstate Database Report, which includes statistics from Erie, Nassau, Onondaga, Suffolk and Westchester Counties, states that a review of 1553 case records revealed that 33 recipients suffered from senility, while 27 suffered from Alzheimer's disease. *See* State Exh. 8 at 11.

more problematic.[10] While this subclass is clearly numerous, and adequacy of representation is apparent, the proposed class representatives' claims do not satisfy the commonality and typicality requirements of Rule 23(a).

The commonality requirement is satisfied where "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). As a preliminary matter, all of the named Plaintiffs reside in and receive personal care services from either the City or Nassau and no other district—nonetheless, the proposed class is statewide. If the challenged TBA programs in each district were uniform, the actual district from which a proposed representative receives personal care services would not affect the statewide nature of these claims. However, the TBA programs in the City and Nassau differ from each other and from those in Westchester and Suffolk in ways that are germane to Plaintiffs' "span of time" claims. Because of the differences in the assessment tools and assessment processes from district to district, it is not at all clear that any assessment flaws in the City or Nassau's programs are present in any other district's program,[11] or that such flaws rise to the level of a systemic flaw.

Each district must offer personal care services as a matter of federal law once the State opts to provide that service. I am not persuaded, however, that the TBA programs used in the various districts constitute a "system" for purposes of Plaintiffs' "systemic" challenges to TBA. Moreover, Plaintiffs have not shown that any recipient or applicant in any social services district other than the City or Nassau has been harmed by "span of time" assessment issues. There is simply no proof that the "span of time" claims of the proposed class representatives

from Nassau and the City share a common issue of fact or law with the proposed class members throughout the State.

For the same reasons, the proposed class representatives' claims are not necessarily typical of the claims of the proposed class. Because TBA programs differ from district to district, the claims of the named Plaintiffs do not "arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *See Robidoux,* 987 F.2d at 936–37. The "practices" of TBA programs throughout the State are not uniform.

Although Plaintiffs have not demonstrated a need for certification of a statewide class, they have met the requirements for certification of district-wide subclasses for the City and Nassau for the "span of time" claims. *See* Fed.R.Civ.P. 23(c)(4) ("class may be divided into subclasses"). The named Plaintiffs' claims raise a common question of law for applicants and recipients within the City and Nassau—whether each district's respective mode of assessment adequately authorizes sufficient hours of care to cover the span of time during which unscheduled and recurring needs occur. Defendants contend that each named Plaintiff's TBA assessment is an individualized, factual determination based on the professional judgment of medical, nursing and social services providers. As a result, Defendants argue that the claims of the named Plaintiffs do not demonstrate a "common problem." *See* Affidavit of Stephen Fisher, Management Analyst III and former Director of Medical Services for Nassau County Department of Social Services, dated March 10, 1997, ¶ 21. However, "[f]actual differences in the individual claims ... are not fatal," particularly where "the actions

---

**10.** As discussed above, Plaintiffs claim that a systemic problem of TBA is that it fails to properly consider in the assessment process the span of time over which unscheduled and recurring needs occur.

**11.** For example, the City employs medical review teams to examine discrepancies between the recommendations of the various assessors prior to finalizing a plan of care. *See* Tr. 1014–16. Nassau has an informal process (prior to a fair hearing) whereby the family, and/or the recipient or applicant can review Nassau's determination

with the assessing nurse or nursing supervisor, which may prompt a reassessment if information was overlooked or if circumstances have changed. Tr. 1216–17. Suffolk assigns assessing nurses by geographic area; thus the same nurse will assess and reassess a patient over a number of years. Tr. 1340–41, 1354. Suffolk assessing nurses also perform a fiscal assessment at the time of a medical assessment to determine whether a patient is eligible for the program. Tr. 1357–58.

or inactions of defendants are not isolated or discrete instances but, rather, form a pattern of behavior that commonly affects all of the proposed [sub]class members." *Marisol A. v. Giuliani,* 929 F.Supp. 662, 690–91 (S.D.N.Y.1996)(citing *Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979)).

For the same reason, the City and Nassau named Plaintiffs have claims typical of City and Nassau "span of time" subclasses. Each district's respective assessment and authorization process constitutes "a pattern of behavior that commonly affects all proposed [sub]class members" within that district. *See id.* The factual basis for the claims of all members of a purported class need not be identical. *See Wilder v. Bernstein,* 499 F.Supp. 980, 982 (S.D.N.Y.1980). In the employment discrimination context, the Court of Appeals has held "[e]vidence indicating that the employer discriminated *in the same general fashion* against the class representatives and against other members of the class" to be sufficient for purposes of Rule 23(a)(3). *See Robidoux,* 987 F.2d at 937 (citing *Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 596–98 (2d Cir.1986)). Similarly, Plaintiffs need only show that the TBA assessment process is performed "in the same general fashion" throughout the district for the named Plaintiffs' claims to satisfy the typicality requirement.

In summary, Plaintiffs are not entitled to certify a statewide class for their "span of time" claims. Although a statewide class is too broad, there is a basis to certify two discrete subclasses. Those subclasses consist of City and Nassau home care applicants and recipients who have received or will receive an inadequate home care authorization due to the alleged systemic failure to authorize sufficient hours of care to cover the span of time during which unscheduled and recurring needs occur.

2. *Rule 23(b)*

Each of the classes above—the notice class, safety monitoring subclass, and Nassau and City "span of time" subclasses—is appropriate for certification under Fed.R.Civ.P. 23(b)(2). Under Rule 23(b)(2), class certification is warranted where a defendant's conduct is generally applicable to the class, thus making final injunctive and declaratory relief appropriate for the whole class. *See* Fed. R.Civ.P. 23(b)(2).

[T]he situation contemplated by Rule 23(b)(2) [is one in which] [a]n order requiring defendants to comply with federal ... law in order to remedy the [alleged] systemic failures that are the source of plaintiff's claims constitutes relief that would serve the entire putative class.

*Marisol A.,* 929 F.Supp. at 692. Because Plaintiffs request similar injunctive relief, certification under Rule 23(b)(2) is appropriate.

B. Preliminary Injunction

1. *Legal Standard*

When seeking to stay "government action taken in the public interest pursuant to a statutory or regulatory scheme," a party seeking a preliminary injunction must demonstrate irreparable harm and a likelihood of success on the merits. *See Jolly v. Coughlin,* 76 F.3d 468 (2d Cir.1996) (quoting *Able v. United States,* 44 F.3d 128, 131 (2d Cir. 1995)). A slightly higher standard applies where "the injunction sought 'will alter, rather than maintain, the status quo'—*i.e.,* is properly characterized as a 'mandatory' rather than 'prohibitory' injunction." *Jolly,* 76 F.3d at 473 (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995)). In such circumstances, the moving party must show a "clear" or "substantial" likelihood of success on the merits. *Id.* The distinction between mandatory and prohibitory injunctions is often elusive, however, and "cannot be drawn simply by reference to whether or not the status quo is to be maintained or upset," *id.* at 474 (quoting *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985)), particularly where the parties may have different perspectives on what constitutes the status quo. *Id.*

Plaintiffs' notice claims unequivocally demand mandatory relief, as Plaintiffs seek to change the content of Defendants' initial and reauthorization notices, some of which

have been in use for many years. With respect to their safety monitoring claims, Plaintiffs contend, in part, that Defendants were providing safety monitoring until fairly recently. Arguably, the provision of safety monitoring, rather than the failure to do so, had been the status quo, and Plaintiffs' safety monitoring claims seeks only to restore it. The State contends that it has refused historically to provide safety monitoring as a task separate from other recognized tasks. Considering the two possible scenarios—either that the State never provided safety monitoring, or has changed its policy so that it no longer does so—Plaintiffs essentially seek mandatory relief here as well. Plaintiffs "span of time" claims lend themselves to a similar analysis. While in one sense, Plaintiffs seek to prohibit Defendants from using TBA for persons with unscheduled and recurring needs, ultimately, Plaintiffs seek to compel Defendants to use a different assessment methodology—a methodology that they believe will lead to the authorization and provision of more extensive personal care services hours. Because they seek a mandatory injunction, Plaintiffs must show a substantial likelihood of success on the merits to succeed in their request for preliminary injunctive relief.

2. *Analysis of Jurisdiction over Statutory Claims Under § 1983*

■■■ In addition to their constitutional claims, Plaintiffs seek to enforce various provisions of the Medicaid Act and its implementing regulations. Section 1983 provides a right of action against any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws" of the United States. Section 1983 provides a remedy for the deprivation of specific rights created by federal law. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 448–49, 107 L.Ed.2d 420 (1989). As such, a § 1983 plaintiff must show that the federal law upon which he or she relies creates an enforceable right under § 1983. *Id.* If Congress has not affirmatively withdrawn the remedy of a cause of action under § 1983, there is a presumption in favor of the right to bring suit. *Chan v. City of New York*, 1 F.3d 96, 103 (2d Cir.1993).

In *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court affirmed the basic analytical framework for determining whether a private right of action exists that had been set forth in *Golden State:* the plaintiff must show that the statute (1) is "intended to benefit" the plaintiff seeking to enforce it; (2) is mandatory rather than hortatory; and (3) is not so vague and amorphous as to be "beyond the competence of the judiciary to enforce." *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. The burden then shifts to the defendant to demonstrate that Congress "by express provision or other specific evidence from the statute itself ... intended to foreclose such private enforcement."[12] *Id.* at 520–21, 110 S.Ct. at 2523 (quoting *Wright v. City of Roanoke Redev. and Hous. Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).[13]

3. *Substantive Challenges to TBA*

a. Safety Monitoring: Disability Discrimination

■■■ Plaintiffs contend that Defendants' refusal to provide safety monitoring as an

---

**12.** In this action, Defendants have not contended that Congress has, in fact, foreclosed any private right of action Plaintiffs seek to enforce.

**13.** A more recent case, *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), did not apply the analysis of *Wilder* and *Golden State* but relied instead on the approach of *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). *Suter* emphasized that when Congress acts pursuant to its spending power, any conditions imposed on federal monies must be set forth "unambiguously". *See* 503 U.S. at 355–56, 112 S.Ct. at 1366. A determination of what is a "mandatory" condi-

tion requires "examin[ation of] exactly what is required of States" by the statutory provision sought to be enforced. *See id.* at 358, 112 S.Ct. at 1367.

In 1996, Congress, in response to *Suter*, enacted 42 U.S.C. § 1320a–2, which states in relevant part that a Medicaid Act provision will "not □ be deemed unenforceable because of its inclusion in a section ... requiring a State plan or specifying the required contents of a State plan." Courts have considered this provision to "resurrect the *Wilder* test, with no *Suter* overlay." *Visiting Nurse Ass'n of North Shore, Inc. v. Bullen*, 93 F.3d 997, 1003 n. 5 (1st Cir.1996).

independent task discriminates against otherwise eligible, mentally disabled applicants and recipients in violation of federal Medicaid law and regulations. Specifically, Plaintiffs contend that this failure breaches the requirement that "the medical assistance made available to any [categorically needy [14]] individual ... shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual" or any medically needy individual. 42 U.S.C. §§ 1396a(a)(10)(B)(i) and (ii); *see also* 42 C.F.R. § 440.240(b)(available services must be "equal in amount, duration, and scope for all recipients within the group"). This comparability requirement "creates an equality principle" between the services offered to any categorically needy recipient and those offered to any other recipient. *See Sobky v. Smoley*, 855 F.Supp. 1123, 1139 (E.D.Cal. 1994).

### i. Jurisdiction

Plaintiffs have an enforceable private right of action under § 1396a(a)(10)(B) and the applicable regulations. First, a plain reading of this section indicates that it is intended to benefit categorically needy persons, which some members of the safety monitoring class undoubtedly are. Second, the comparability provision uses mandatory, rather than precatory language when it states that the medical assistance offered to the categorically needy "shall not" be less than that offered to other categorically or medically needy individuals. Finally, this provision is within the competence of the judiciary to enforce, as it requires a court to compare the level of services provided to one recipient with those given another and to determine whether those services are comparable. The standards to be applied are set by the State's own actions—*i.e.* the State itself sets the level of care to be provided to both of these groups, which is the standard by which the level of services given the categorically needy is measured.

### ii. Substantial Likelihood of Success on the Merits

As noted above, the State defines "medical assistance" under its Medicaid program, which includes personal care services, as the provision of medical services "which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with such person's capacity for normal activity, or threaten some significant handicap." N.Y. Soc. Serv. Law § 365–a(2). Personal care services include the provision of assistance with personal hygiene, feeding, dressing, and housekeeping that are "essential to the maintenance of the patient's health and safety in his or her own home." 18 N.Y.C.R.R. § 505.14(a)(1). Plaintiffs contend that historically, safety monitoring and supervision [15] of non-self-directing individuals has been part of the home care services program, and that these services are "essential to the maintenance of the patient's health and safety" as required by State law.

14. *"Categorically needy* refers to families and children, aged, blind or disabled individuals, and pregnant women ... who are eligible for Medicaid" and "who, generally, are receiving or deemed to be receiving cash assistance under the [Social Security] Act." *See* 42 C.F.R. § 436.3. *Individuals who meet the requirements for Medicaid, but are not receiving cash assistance although they are qualified to do so (e.g. individuals who would be eligible for cash assistance if they were not in medical institutions) are also classified as categorically needy. See id.* Other categories of individuals that are not relevant for present purposes can also be considered categorically needy. *See* 42 C.F.R. §§ 436.200–436.230. *"Medically needy* means families, children, aged, blind or disabled individuals and pregnant women who are not ... categorically needy but who may be eligible for Medicaid ... because their income and resources are within limits set by the State under its Medicaid plan." *Id.* § 436.3.

15. Supervision in this context refers to supervision of the patient, not supervision of the home care aide. Supervision of the home care aide is provided by a self-directing individual on behalf of the non-self-directing patient, who would otherwise provide such supervision himself or herself. *See* 18 N.Y.C.R.R. §§ 505.14(a)(4)(ii)(a)-(c). Supervision of the home care aide includes making decisions and informing the aide about what and when the non-self-directing patient will eat, when the non-self-directing patient should go outside for a walk, etc., on behalf of the non-self-directing patient. The home care aide cannot "supervise" himself or herself with respect to these decisions.

The State does not require the various districts to provide safety monitoring as a task at times when "recognized" personal care tasks, such as toileting or feeding, are not being performed. Rather, the State considers safety monitoring as a component of the performance of a recognized task, *e.g.* the personal care aide may monitor the patient's safety when the patient walks to the bathroom to ensure that the patient does not fall. Tr. 717, 809, 821; State Exh. 1. However, each local social services district has discretion to manage its own personal care services program within federal and state law guidelines, N.Y. Soc. Serv. Law § 62(1); the "option" of "authorizing additional hours called safety monitoring" is within that discretion. Tr. 807, 870–71. The City, Nassau, Westchester, and Suffolk do not exercise this option; none provide safety monitoring as a separate task. Tr. 717–18 (City) 1215 (Nassau), 1312–13 (Westchester), 1395 (Suffolk).

The question posed by Plaintiffs' claim under § 1396a(a)(10)(B) is whether the safety monitoring required by mentally impaired clients is comparable to the services provided to physically impaired clients such that the failure to provide the service violates the "equality principle" embodied in this section.[16] Because safety monitoring is comparable to other personal care services tasks, Defendants' failure to separately assess that task violates the comparability requirement of the Medicaid Act.[17]

Defendants' explanation for declining to provide safety monitoring is that safety monitoring is not a "task" in the same sense as assistance with bathing is a "task". "Tasks," according to Defendants, are "hands-on". In Defendants' lexicon, safety monitoring is akin to "companionship", a service not provided by personal care aides.[18] *See* Tr. 468; Affidavit of Kathleen A. Sherry, Medical Assistant Specialist III of the New York State Department of Health ("Sherry Aff."), undated but sworn on March 17, 1997, ¶¶ 33–35. However, this distinction is not the bright line that Defendants contend. The testimony revealed that in fact, many recognized "tasks" are not always performed "hands-on," such as reminding or "cuing" a patient to take medication or to eat. *See* Tr. 422–423. An individual with mental disabilities may forget that he or she has taken medication already, and must be monitored to ensure that medication is not taken two or three times more than necessary. Individuals with mental impairments may forget where the bathroom is, although they may not be incontinent. Are these activities properly defined as "safety monitoring" or as "assistance with medication" and "assistance with toileting"? For patients with mental disorders, these distinctions are more than semantic with respect to the number of hours for which they are authorized to receive personal care.

Defendants might concede that some of the above activities would be recognized by the personal care services program as tasks. However, because Defendants also contend

16. For purposes of this discussion, I consider only those mentally impaired clients who meet the eligibility requirements for the program, namely, those that are medically stable and are either self-directing or have a self-directing individual to provide direction to the home care services aide. *See* 18 N.Y.C.R.R. § 505.14(a)(4)(ii)(a)-(c). In this regard, I disagree with Defendants' contention that the self-directing individual acting on behalf of the non-self-directing patient needs to have substantial daily contact with the patient in his or her home. *See* State Exh. 2 (Administrative Directive, 92 ADM–49, dated December 1, 1992). Section 505.14(a)(4)(ii)(a)-(c), the relevant State regulation from which 92 ADM–49's "substantial daily contact" requirement is drawn, does not itself require that the self-directing individual have contact with the non-self-directing individual within the home several times a day; in fact it is silent about where and how often the contact must take place. Second, it seems unlikely that daily contact within the home is always required when a social services agency, by regulation, can also provide direction for the non-self-directing recipient without substantial daily contact with the recipient. *See id.* § 505.14(a)(4)(ii)(c).

17. Defendants also raise the issue of fiscal assessment. In concluding that Defendants must assess the need for safety monitoring separately, I do not rule out the possibility that many recipients and applicants may not meet the fiscal cap imposed on personal care services programs. For a full discussion of that issue, *see infra* pp. 161–62.

18. Plaintiffs do not dispute that companionship is not a personal care service. *See* Pls.' FOF Pt. IV, ¶ 3.

that recognized tasks are "hands-on," it is not clear that these services are consistently provided to the mentally disabled, while comparable services are provided to the physically impaired. For example, Defendants would indisputably provide hands-on assistance with toileting, in the form of help getting to the commode or toilet several times a day, to a recipient who has difficulty with ambulation. Simply reminding a mentally disabled client where the bathroom is *several times a day,* however, might not be provided to the mentally disabled client, because the assistance is not "hands-on" and might result in "down-time" for the personal care services aide between toileting incidents. Both patients need comparable assistance with toileting, however. The failure of TBA to ensure that the mentally disabled receive non-"hands-on" assistance with activities such as toileting, feeding or medication violates the comparability requirement of § 1396a(a)(10)(B).

Putting aside the somewhat ambiguous "hands-on hands-off" distinction, Defendants contend that they have not historically, and do not now provide safety monitoring to guard against such dangers as wandering out of the house or turning on the stove, both of which present real hazards to individuals with Alzheimer's disease or other mental impairments.[19] Because they do not provide safety monitoring as an independent task in these circumstances, Defendants often determine that an individual with dementia or Alzheimer's disease cannot be safely maintained at home with the home care hours designated for "recognized" tasks.[20]

This thorny issue presents a classic chicken-egg problem. Although Defendants attempted to show that many persons with mental impairments are inappropriate for home care, the evidence showed that the opposite is often true. One of Plaintiffs' experts, Dr. Diane Meier, testified that a home attendant would be capable of monitoring an Alzheimer's patient's safety under many circumstances. Tr. 535. She also testified that many patients with mild cognitive impairment can be safely maintained in their homes without constant, 24-hour assistance. Tr. 469–470. Plaintiffs also presented testimony from Adeena Horowitz, a social worker who specializes in geriatric care, who stated that persons with Alzheimer's are often cared for safely at home throughout all stages of the disease, so long as safety monitoring is provided. Tr. 628, 634–5.

The testimony suggests that it is Defendants' failure to provide safety monitoring, rather than the *condition of the patient* who needs safety monitoring, that causes maintenance at home to be unsafe for a patient with a mental disability. Although Defendants are permitted, within limits, to determine the scope of services offered by their personal care programs, they have not explained why preventing a dementia patient from wandering into the street is not comparable to turning and repositioning a bedbound recipient several times a day to prevent bedsores. Both "services" can be performed by a personal care aide and are "essential to maintaining the patient's health and safety in his

---

19. This assertion is belied by the State's former regulations, which provided that for initial applicants, a 4 hour per day, 28 hour per week cap on personal care services could be overridden if "monitoring of the patient's safety is required as part of a plan of care for a non-self-directing patient ...." 18 N.Y.C.R.R. § 505.14(6)(ii)(b)(v). The cap was invalidated in *DeLuca v. Hammons,* 927 F.Supp. 132 (S.D.N.Y.1996), and with it, its exceptions, including the safety monitoring exception; however, it implies that safety monitoring was, in some circumstances, a stand alone task. In addition to this regulation, additional support for the proposition that the personal care services program provided safety monitoring as a separate task is offered by the State's own study of New York City home care services programs prior to the implementation of TBA. *See* Pls.'

Exh. 15. Safety monitoring appears as one item in a list of "services required" by the home care population in New York City. *See id.* at 15. This separate listing is inconsistent with the City and State's assertions that safety monitoring is only a component of other recognized tasks. Finally, Kathleen Sherry of the New York State Department of Health admitted that "at one time, I guess we'd have to say that we did" consider safety monitoring as a separate task. Tr. 807.

20. For example, in the case of Amelia Russo, Nassau authorized 4 hours of tasks without safety monitoring, and then determined that she could not be safely maintained at home with only four hours of care and was therefore inappropriate for personal care services.

or her own home." *See* 18 N.Y.C.R.R. § 505.14(a)(1).

The State offers as some justification for its position a set of rules proposed in 1996 by the Department of Health and Human Services ("HHS") which, if adopted, would have affected the personal care services program. Tr. 810; State Exh. 3. These proposed rules led to an exchange of letters between the State and the Health Care Financing Administration ("HCFA"), a division of HHS responsible for administration of the Medicaid program, by which the State attempted to clarify the federal government's position on safety monitoring as a separate task. *See* State Exhs. 4–7. In response to an inquiry from the State, HCFA wrote:

> Monitoring an individual's activities should be an inherent part of personal care services; that is, a provider that is assisting an individual who is not self-directing and is at risk to themselves or others in meal preparation, bathing ... etc., should also be expected to monitor the individual's activities as an integral part of the personal care services provided. However, we believe that the supervising/monitoring of an individual, by itself, without the provision of recognized personal care services, would not be considered personal care services for Medicaid purposes.

State Exh. 5, (November 19, 1996 Letter from HCFA to NYS Dep't of Health). The State concluded, based on this response, that safety monitoring was not to be provided as a separate task. Tr. 817.

HCFA's response to the State's queries is not crystal clear. A plausible reading of its response is that safety monitoring is permissible as a separate task only where the recipient is receiving other personal care services, but not where safety monitoring is, in itself, the only task being performed. HCFA's letter does not compel the conclusion that the provision of safety monitoring as a separate task is not a permitted personal care service. Indeed, the testimony revealed that most

patients in need of safety monitoring also need assistance with other ADLs. *See* Tr. 433, 434, 629.

The State's interpretation of HCFA's letters is best understood in light of the State's difficult battle to maintain the public fisc in the face of the escalating cost of the personal care services program. *See* Defs.' FOF ¶¶ 12–17; Sherry Aff. ¶¶ 37–39, 41, 45. All of New York State's home care programs constitute approximately $2.7 billion per year, totaling over 4% of the State's budget. *See* Sherry Aff. ¶ 38. The State attests to the fact that TBA is an effort to "reduce[] wasteful expenditures of limited Medicaid funds in the assessment process by avoiding 'down time,'" or periods when a personal care services aide is in a recipient's home but not assisting a patient with "hands-on" tasks. Defs.' FOF ¶ 17. To address the rising cost of home care services, the State has integrated a fiscal assessment into its assessment process, which, as noted above, caps the cost of home care services at 90% of the cost of a residential health facility, if the individual does not meet one of five specified exceptions.[21] *See* N.Y. Soc. Serv. Law § 367–k. Recipients are entitled to continued care until a fair hearing if they timely challenge a termination of their services based on fiscal assessment concerns.[22] *Id.* § 367–k(f). Moreover, care cannot be terminated until appropriate long term care services are made available. *Id.* § 367–k(e).

To the extent, therefore, that Defendants attempt to use fiscal concerns as a justification for eliminating (or not providing in the first instance) safety monitoring from the personal care services program, Defendants put the cart before the horse. As Plaintiffs have argued, individuals eligible for personal care services must first be assessed correctly for the number of hours of personal care services they need—whether or not that level of service may then make them ineligible based on the fiscal assessment outlined in

---

**21.** The average monthly cost of split-shift care in the City is approximately $8,000, while the average monthly cost of nursing home care is $3,751. Tr. 729.

**22.** Applicants who do not meet fiscal requirements are also entitled to receive home care services pending appropriate long-term care placement pursuant to *Burland v. Dowling,* Index No. 407324*93 (N.Y.Sup.Ct. Nov. 15, 1994) (Lebedeff, J.).

§ 367–k. If the inclusion of time for safety monitoring forces these eligible individuals beyond the fiscal cap, they are entitled to personal care services until the State can provide them with appropriate residential care. If the services provided them do not exceed the fiscal cap, they are entitled to an equivalent number of hours as those provided to persons with physical disabilities.

The failure to provide safety monitoring to individuals with mental disabilities, whether based on a distinction between "hands-on" and "hands-off" assistance, or based on a determination that safety monitoring is not comparable to other tasks, violates the comparability provisions of the Medicaid Act. In light of the foregoing, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their safety monitoring claim under § 1396a(a)(10)(B) and 42 C.F.R. § 440.240(b).[23]

### b. Span of Time Claims of Individuals with Unscheduled and Recurring Needs

#### i. Medicaid Act Claims

■■ Plaintiffs also contend that Defendants' respective TBA programs result in arbitrary assessments for individuals with unscheduled and recurring needs in violation of the comparability requirement of 42 U.S.C. § 1396a(a)(10)(B) and 42 C.F.R. § 440.240(b). Plaintiffs claim that although the individual districts may contend that they do not provide TBA plans of care for individuals with needs that recur or are unscheduled over a 24–hour period, in fact those individuals are not exempt from TBA and receive inadequate plans of care. Plaintiffs base this claim, in part, on their assertion that the TBA forms are mechanized and do not adequately provide for overrides of allotted task times where more time is necessary for an individual recipient. Plaintiffs also contend that the TBA forms, as currently designed, do not sufficiently integrate an escape valve from TBA for individuals with recurring or unscheduled needs. With respect to the City's TBA forms, Plaintiffs assert that those forms do not sufficiently alert the nurse assessors to the *"Mayer 3"* exemption.[24]

#### a) Substantial Likelihood of Success on the Merits

Plaintiffs have presented voluminous documentary evidence and extensive testimony on the issue of individuals with recurring or unscheduled needs. After a comprehensive review of that evidence, I conclude that

**23.** In addition to this Medicaid Act claim, Plaintiffs also contend that Defendants' failure to provide safety monitoring for the mentally disabled violates the Rehab Act and the ADA. The Rehab Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.

Defendants argue in response that many persons with mental disabilities are not qualified for personal care services because they often cannot be safely maintained at home. In addition, Defendants argue that the mentally disabled are not entitled to enhanced services, *e.g.* the provision of safety monitoring as a separate task, when that service would "fundamentally alter" the nature of personal care services programs, which is not required by the Rehab Act or the ADA. *See Southeastern Community College v. Davis*, 442 U.S. 397, 408–09, 99 S.Ct. 2361, 2368–69, 60 L.Ed.2d 980 (1979); 28 C.F.R. § 35.130(b)(7).

It is not entirely clear at this preliminary injunction stage whether Plaintiffs are or are not entitled to relief under either of these statutes. As a result, because Plaintiffs have a substantial likelihood of success on their safety monitoring claim under § 1396a, and because I have granted preliminary relief on that claim, *see* Part II. B.3.a., I need not reach these other bases for their safety monitoring claims at this time. *See Girls Clubs of Am., Inc. v. Boys Clubs of Am., Inc.*, 683 F.Supp. 50, 52 (S.D.N.Y.), *aff'd*, 859 F.2d 148 (2d Cir.1988).

**24.** The *"Mayer 3 exemption"* resulted from this Court's decision in *Mayer v. Wing*, 922 F.Supp. 902 (S.D.N.Y.1996), in which I ordered that TBA not be used to assess the personal care services needs of individuals who have continuous needs that span 24 hours. In an effort to comply with that Order, the City has applied the *Mayer* Order to circumstances in which the individual would need 24 hour care but for the presence of social supports ·in the home who provide nighttime care. This latter category is the *"Mayer 3 exemption."*

Plaintiffs have failed to establish a substantial likelihood of success on their claim that TBA results in arbitrary determinations for persons with recurring or unscheduled needs.

First, Plaintiffs claim that the TBA forms and assessment procedures do not sufficiently account for needs that occur over a span of time, *e.g.* toileting needs. Rather, Plaintiffs contend that TBA nurse assessors allot a fixed number of minutes per task, add up those numbers for a total number of minutes, and then mechanically grant the equivalent number of hours without regard to whether the identified needs can be met within that number of hours. Where variations from the standard task times occur, Plaintiffs contend, those variations are random and arbitrary, *i.e.* a nurse assessor adds in some number of hours or minutes to make up the span of time without any written guidelines or standards.

Plaintiffs mischaracterize the assessment forms and the assessment process. While the City and Nassau's TBA forms are not "friendly" to overrides for allotted task times or to recording the span of time over which needs occur, they are flexible enough in design to permit the nurse assessor to address recurring or unscheduled needs.[25] Each of the Defendants' witnesses consistently stated that task times are not rigid and can be changed. *See, e.g.,* Tr. 708 (City), 822 (State), 1204 (Nassau). For example, Frances Louth, Acting Deputy Director of Field Operations of the City's Human Resources Administration, testified that the City's nursing assessment form, the M–27r, permits the nurse assessor to cross out the suggested task time, write the new time above, and explain the need for the override in the "comment" section. *See* City Exhs. B, P, Q; Tr. 708–709, 1010. Assessing nurses are trained to follow this procedure whenever the suggested task time is inadequate to meet a client's health and safety needs. Tr. 708, 1010, 1013; City Exhs. P, Q. Ms. Louth also testified that nurses are trained to consider the span of time during which an individual's needs occur, and to account for that in the plan of care. Tr. 1025–27. The City's form also has a box which, if checked, indicates that the patient cannot be safely left alone, which also functions as an additional check on merely totaling suggested task times. *See* City Exh. B.

Similarly, Nassau's written guidelines and oral instructions to assessing nurses allow an override in task times where necessary and include those instances where a task or tasks could span 24 hours. *See* Nassau Exhs. D, E; Tr. 1203–05. Nassau's form also includes an area called "other," in which the nurse assessor can describe the "span of time" needs of a particular patient. *See id.;* Tr. 1202–03, 1205. Based on the testimony adduced at the hearing, neither the City's nor Nassau's TBA forms or processes are systemically flawed in a way that results in arbitrary and insufficient assessments.

Plaintiffs also contend that the individual cases and case files received in evidence reveal a pattern of arbitrary assessments that can only be attributed to a systemic flaw in TBA. Plaintiffs contend that the hours of care authorized for many of these recipients and applicants were inadequate to satisfy the needs identified by the nurse assessors on the TBA form itself.[26] Although my review

---

**25.** I do not consider any other social services districts in this discussion because there is no certified statewide class for this claim. *See* Part II.A.1.c., *supra.*

**26.** For example, named Plaintiff Sidonie Bennett was assessed as having a need for total assistance with toileting, changing of diapers, and transferring, as well as a need for some assistance with indoor mobility, and yet she was only authorized for 73.3 hours of task time, although these needs span a 24–hour period, and despite her treating physician's recommendation for 24–hour care. Intervenor–Plaintiff Ruvim Aselrod was reduced from 84 hours of service per week (including a break of one hour for the attendant's lunch, making actual service time 77 hours per week) to 58 hours per week under TBA despite the need for assistance with bathing, grooming, dressing, toileting, transferring with equipment, preparation for bed, assistance with cutting food for three meals, preparation of three meals and two snacks, and assistance with medication 4 times daily. *See* Pls.' Exh. 51. Other examples can be found in Exhibit 5 (excerpts from 23 case files) and Exhibits 40 through 66, which contain parts of several case files from City and Nassau recipients.

Exhibits 54 through 66 were conditionally admitted at the hearing. In this regard, after considering the parties' submissions on the issue, I find that the Defendants' objections are ad-

of these files leads me to conclude that some of the TBA plans of care were inadequate to meet the needs of individual recipients or applicants, these cases can be adequately challenged by the State fair hearing process and Article 78 procedures.

Each of these cases involve highly individualized questions of fact raised by the particular circumstances of each patient—facts that cannot be reviewed in their entirety in this proceeding, but which can be reviewed in a fair hearing and an Article 78 proceeding. While there will always be individual errors in a program of this magnitude, these alleged errors do not convincingly demonstrate a systemic flaw in the City's or Nassau's TBA programs.

In addition, assessments for home care services are the product of the professional judgment of physicians, nurses, and social workers. As such, errors that are made reflect errors in human judgment rather than systemic flaws in TBA. As Defendants stressed throughout the hearing, the assessors involved in each TBA program are health care professionals who can be expected to act in the best interests of the health and safety of their patients.

Plaintiffs essentially ask this Court to second-guess these professional judgments. This is simply not possible. Review is available via the fair hearing process, and, if necessary, through an Article 78 proceeding in New York Supreme Court. *See* 42 C.F.R. § 431.220; N.Y. Soc. Serv. Law § 22; C.P.L.R. § 7803(4). It is true that

> [t]he administrative appeal process is not a substitute for proper prior procedures at the agency level ... [and that] the administrative appeal process may not regularly

be used as a vehicle to conduct a requisite inquiry which the agency continually fails to institute.

*See Allen v. Blum*, 85 A.D.2d 228, 448 N.Y.S.2d 163, 169 (1st Dep't 1982), *aff'd*, 58 N.Y.2d 954, 460 N.Y.S.2d 520, 447 N.E.2d 68 (1983). In this case, however, proper procedures exist at the agency level. Those procedures are reflected both in the TBA forms and in the assessment process.

Plaintiffs further contend, with respect to the City, that TBA as administered does not result in consistent *Mayer* 3 exemptions, that patients entitled to 24-hour care under the exemption are denied appropriate and federally mandated levels of care, and therefore that the City's TBA program is systemically flawed. As evidence of this flaw, Plaintiffs point to the admission of Frances Louth that of 23 case files of individuals with unscheduled needs, 9 cases that should have been identified as *Mayer* 3 exemptions were not identified as such, and that only one case was given a traditional rather than a TBA plan of care. Tr. 1040–44; Pls.' Exh. 5.

The City's TBA program has been in existence approximately one year and is not yet fully implemented. Tr. 565. In July 1996, the City began to use TBA for initial applicants. *Id.* In October 1996, the City commenced reassessments of recipients to determine whether their plans of care can be converted to TBA. Tr. 565–66. It is entirely reasonable that the City is continuing to work out the "kinks" at this early stage of its TBA implementation. Considering the nascency of the City's program, Plaintiffs have failed to show that this small sample of errors demonstrates a likelihood that the TBA assessment process is systemically flawed.[27]

---

dressed to the probative value of this evidence, rather than admissibility. Exhibits 54 through 66 are therefore received in evidence.

**27.** Plaintiffs also contend that TBA, as administered by Defendants, violates the federal requirement that "[e]ach service must be sufficient in amount, duration and scope to reasonably achieve its purpose." *See* 42 C.F.R. § 440.230(b). Plaintiffs claim that Defendants' TBA programs violate this requirement because they fail: 1) to provide time for safety monitoring and supervision when those services are medically necessary; 2) to ensure that overrides of sug-

gested task times occur in a rational and predictable way; and 3) to assure that "span of time" as well as recurring and scheduled needs are met at the times those needs arise.

Defendants first argue that there is no private right of action under this, or indeed any, Medicaid regulation. In view of my conclusion that Plaintiffs have failed to demonstrate substantial likelihood of success on the merits of their comparability claim with respect to unscheduled and recurring needs, there is no need to decide this jurisdictional question. Even if there were a private right of action under this regulation, it

ii. Due Process Claims

Plaintiffs also claim that TBA violates the Due Process Clause of the Fourteenth Amendment, which "requires that government officials refrain from acting in an irrational, arbitrary or capricious manner." [28] *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985). Plaintiffs contend that the manner in which TBA programs are administered in the State violates the due process requirement that entitlements to government benefits must be made according to "ascertainable standards which are applied in a rational uniform manner." *Holmes v. New York City Hous. Auth.,* 398 F.2d 262, 265 (2d Cir.1968)(housing authority may not arbitrarily decide, with neither standards nor a "fair and orderly procedure," which prospective tenants to admit from public housing waiting list).

a) Substantial Likelihood of Success on the Merits

■ Just as TBA does not result in arbitrary assessments in violation of the Medicaid Act, neither the City's nor Nassau's TBA programs are arbitrary for due process purposes. Rather than failing to provide ascertainable standards, TBA requires a detailed examination of the needs of recipients and applicants. While individual TBA assessors may, at times, incorrectly assess a patient's needs, the programs themselves provide ade-

quate standards by which those needs should be measured. Moreover, to the extent that errors occur, the due process needs of recipients and applicants with recurring and unscheduled needs are sufficiently protected by the fair hearing process, and, if necessary, by an Article 78 proceeding.

Plaintiffs have not shown that the design and/or implementation of the City's or Nassau's TBA programs results in arbitrary assessments on a systemic level in violation of 42 U.S.C. § 1396a(a)(10)(B). Nor have Plaintiffs shown that Defendants' TBA programs result in arbitrary assessment in violation of constitutional due process guarantees. Because Plaintiffs have not demonstrated that these programs violate federal law or the Constitution, Plaintiffs do not have a substantial likelihood of success on the merits of their "span of time" needs claims.[29]

4. *Procedural Challenges to TBA: Notice Claims*

■ The Fourteenth Amendment prohibits the state from depriving a person of life, liberty or property without due process of law. Plaintiffs' Medicaid benefits are a protectable "property interest" under the Fourteenth Amendment. *See Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare recipients have property interest in continued payment of welfare benefits). Plaintiffs assert that TBA notices

would fail for the same reasons discussed in the comparability analysis.

28. To the extent that the scope of Plaintiffs' claim that Defendants' safety monitoring policy is arbitrary in violation of the Medicaid Act and due process guarantees, I do not reach those claims, as I have granted relief to members of the safety monitoring subclass on an alternative ground. *See* Part II.B.3.a.

29. Plaintiffs also contend that Defendants' TBA programs, with respect to "span of time" needs, violate the federal Medicaid requirement that a State Medicaid plan be in effect statewide and in all political subdivisions of the State. *See* 42 U.S.C. § 1396a(a)(1); 42 C.F.R. § 431.50. Plaintiffs further contend that variations in the administration of and standards for TBA violate the requirement that a State's Medicaid plan must "provide for a single State agency to administer or supervise the administration of the plan." 42 U.S.C. § 1396a(a)(5); *see also* 42

C.F.R. § 431.10(e). With respect to the statewide plan claim, assuming, *arguendo,* that a private right of action under § 1396a(a)(1) exists, Plaintiffs have not presented any evidence at this preliminary stage that the personal care services program is not in effect statewide. To the extent that Plaintiffs assert that the level of service provided varies from district to district, it is not TBA, but the subjective determinations of the individual assessors that lead to differences in the level of care provided. In this regard, TBA is no more subject to error or abuse than any other form of assessment. In fact, mistakes can just as easily be made with another assessment tool.

With respect to Plaintiffs' single state agency claim, it is highly unlikely that there is a private right of action under § 1396a(a)(5). While this section is phrased in mandatory terms, it does not appear to be intended to benefit Plaintiffs. *See Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517. Additionally, Plaintiffs have not shown at this stage that the variations between TBA programs state a claim under this section.

should include the total number of hours authorized, the specific tasks to be performed, the time of day those tasks will be performed, and the reasons for any reduction in services. To the extent that Defendants' TBA notices do not include some or all of this information, Plaintiffs contend that those notices violate both due process guarantees as defined by *Goldberg*, as well as the federal requirement that recipients be provided with timely and adequate notice of agency decisions. *See* 42 C.F.R. §§ 431.206, 431.211; 18 N.Y.C.R.R. §§ 358–2.2(a)(ix) and (xi). In addition, Plaintiffs claim that the defects in Defendants' notices violate the requirement that Medicaid recipients be afforded recourse to a fair hearing process, because they fail to give recipients adequate notice of the services they are receiving. *See* 42 U.S.C. §§ 1396a(a) and (c).

Basic requirements of due process mandate that individuals threatened with the deprivation of a government entitlement receive "timely and adequate notice" detailing the reasons for the government's action. *Goldberg*, 397 U.S. at 267–68, 90 S.Ct. at 1020–21. *See also Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Thus the notices sent by the districts must give adequate notice of the district's determination about a recipient's or applicant's request for personal care services such that a recipient or applicant can timely challenge a decision with which he or she disagrees. *See Ellender v. Schweiker*, 575 F.Supp. 590, 600–03 (S.D.N.Y.1983); *see also Henry v. Gross*, 803 F.2d 757, 766 (2d Cir. 1986). The scope of information which should be provided to the recipient is at the heart of Plaintiffs' notice claims.

The City's notice to initial applicants, which does not include the total amount of authorized assistance hours, does not meet due process requirements. The total number of home care hours authorized by the City and the allocation of those hours by the number of hours per day is information essential to an applicant's evaluation of whether to challenge an initial authorization, and

its conspicuous absence severely hampers an applicant's ability to secure an opportunity to be heard at a fair hearing. As a basic principle, the number of hours is a yardstick by which an applicant measures whether the authorized care will in fact meet his or her personal care needs. The number of hours authorized puts an applicant on notice that a challenge is warranted.

The additional notice requirements that Plaintiffs seek are not mandated by due process guarantees. In this regard, Plaintiffs seek to include the list of tasks to be performed and the daily or weekly schedule for those tasks on each notice. Although it would be admirable if each district included this information, due process does not require such detail. Rather, the notices need only be specific enough to put applicants and recipients on notice that they may not receive adequate care. As currently constructed, the City's notices include the tasks to be performed, while the Nassau and Suffolk notices include the level of services [30] that an applicant or recipient will receive. This information in combination with the total number of hours authorized for these tasks is sufficient to put an applicant or recipient on notice to challenge a determination with which he or she disagrees. In addition, the detailed reasons that must be provided for a reduction in service further alert personal care services recipients to the need for a fair hearing.

In summary, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that all notices of TBA determinations for applicants and recipients must include the number of hours authorized and the allocation of those hours by the number of hours per day. They have failed, however, to make such a showing with respect to the inclusion of specific tasks to be performed or schedules.

5. *Irreparable Harm*

For those claims for which Plaintiffs have demonstrated substantial likelihood of success on the merits, they have also satis-

30. This information tracks 18 N.Y.C.R.R. § 505.14, *i.e.* "Level I (Environmental and Nutritional Functions);" "Level II (Personal Care, En-vironmental and Nutritional Functions." *See* Pls.' Exh. 35 (Suffolk County Notice)).

fied the requirement of showing that they will suffer irreparable harm absent preliminary relief. Members of the class of mentally disabled recipients and applicants who currently do not receive safety monitoring as a task face the harm of inadequate authorizations for personal care services. Alternatively, they face the risk of the denial of personal care services to which they are entitled, without the provision of aid—continuing until an appropriate residential placement can be secured. Similarly, initial applicants for personal care services who receive constitutionally inadequate notices may unwittingly forfeit their right to challenge an inappropriate assessment, which may result in the provision of inadequate services. Considering how sick and frail many personal care services clients are, an inadequate home care authorization could have a devastating effect on their health and safety. Such harm constitutes irreparable harm for purposes of this preliminary injunction.[31]

### 6. *Balance of Public Interests*

The Court of Appeals has recently stated that "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Time Warner Cable of New York City. v. Bloomberg L.P.,* 118 F.3d 917, 929 (2d Cir.1997). A court should do so to minimize the possibility that "a claim that appears meritorious at a preliminary stage but is ultimately determined to be unsuccessful will have precipitated court action that might needlessly have injured the public interest." *Id.*

Both sides of the safety monitoring issue implicate public interest concerns. On the one hand, the public interest will benefit if the health and safety of the mentally disabled are furthered by the inclusion of safety monitoring in TBA programs. The public interest will also be harmed if members of this group are either denied benefits to which they are entitled, or are left to fend for themselves for several hours a day in a home situation which is hazardous. On the other hand, there is a public interest in preserving the scarce resources available for personal care services programs, and managing the cost of such services effectively. The balance of the public interest favors the issuance of an injunction. While the State's fiscal concerns are valid ones, the State has already developed a mechanism for addressing the cost of personal care services—the fiscal assessment.

With respect to the notice issue, the burden on the City is so slight, while the benefit to the public interest is so great, that the balance of the public interest undoubtedly favors an injunction. The City need only add one item of information to its notice—information which is within its possession and will take little effort to provide. The public interest will benefit by affording home care services applicants a full opportunity to challenge their initial authorizations for home care.

### III. CONCLUSION

Plaintiffs have met the requirements for certification of a statewide class of all New York State applicants and recipients for personal care services whose need for home care services has been or will be determined pursuant to TBA for purposes of their notice claims. They have met the requirements of certification of a statewide subclass of applicants and recipients with safety monitoring needs. Although they are not entitled to a statewide subclass of applicants ·and recipients with "span of time" needs, they have met the requirements for certification of City and Nassau subclasses for purposes of these claims as they relate to those districts.

Plaintiffs have shown · both irreparable harm and a substantial likelihood of success on the merits of their safety monitoring claim. They have also met this burden with respect to their challenge to the City's initial notice of authorization. Plaintiffs have not shown a likelihood of success on the merits of their "span of time" claims against the City

---

**31.** Because Plaintiffs have not shown a substantial likelihood of success on the merits of their "span of time" claims, I do not reach the issue of irreparable harm for those claims.

or Nassau, or on the remainder of their notice claims. It is accordingly

ORDERED that Defendants include safety monitoring as a separate task on their TBA forms, assess the need for safety monitoring as a separate task, and calculate any minutes allotted for safety monitoring as part of the total personal care services hours authorized, for both applicants and recipients; and it is further

ORDERED that the City of New York include the total number of task hours authorized and the allocation of those hours by the number of hours per day as a component of its initial notice, and, to the extent this information is not already included, as a component of its reauthorization notice.

SO ORDERED.